U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

2020 JUL 13 AM 8: 48

CLERK
BY  LAW
DEPUTY CLERK

UNITED STATES OF AMERICA,
*ex rel.* TOBY MARKOWITZ AND
ELIZABETH RINGOLD,

          Plaintiffs,

vs.

NEXTGEN HEALTHCARE, INC.

          Defendant.

FILED UNDER SEAL

Case No. 2:18-cv-00195-wks

**UNITED STATES' COMPLAINT IN INTERVENTION**

BRIAN BOYNTON
Principal Deputy Assistant Attorney General
JAMIE YAVELBERG
EDWARD C. CROOKE
CHRISTELLE KLOVERS
KELLEY HAUSER
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
edward.crooke@usdoj.gov
christelle.klovers@usdoj.gov
kelley.hauser@usdoj.gov

NIKOLAS P. KEREST
United States Attorney
LAUREN ALMQUIST LIVELY
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402
lauren.lively@usdoj.gov

Attorneys for the United States

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* **TOBY MARKOWITZ AND ELIZABETH RINGOLD,** | FILED UNDER SEAL |
| | **Case No. 2:18-cv-00195-wks** |
| **Plaintiffs,** | **UNITED STATES' COMPLAINT IN INTERVENTION** |
| **vs.** | |
| **NEXTGEN HEALTHCARE, INC.** | |
| **Defendant.** | |

1.     The United States of America (United States) files this complaint in partial intervention for the limited purpose of settlement to recover damages arising from false statements that Defendant NextGen Healthcare Inc. (NextGen) made or caused to be made and from false claims that NextGen caused healthcare providers to submit to the Department of Health and Human Services (HHS) and state Medicaid agencies for federal incentive payments through Electronic Health Record (EHR) Incentive Programs.

2.     Pursuant to the Health Information Technology for Economic and Clinical Health Act (HITECH Act), the HHS Office of the National Coordinator for Health Information Technology (ONC) established a program to test and certify EHR technology, and the Centers for Medicare & Medicaid Services (CMS) established EHR Incentive Payment Programs (also known as the "Meaningful Use programs"), which provided incentive payments to healthcare providers (users) who attested to "meaningful use" of certified EHR technology.

3.     NextGen is a health information technology and services developer that developed EHR technology marketed and sold to healthcare providers throughout the United States.

4.      NextGen knew that in order to receive incentive payments under the Meaningful Use programs, eligible healthcare providers needed to attest to using certified EHR technology. NextGen also knew that the technology it held out as its EHR product would not satisfy all the requirements for certification under the 2014 Edition of ONC's certification program. Nonetheless, to secure a competitive advantage, NextGen improperly obtained certification for its EHR product under the 2014 Edition, which providers then used to obtain incentive payments.

5.      In order to gain certification for its EHR product, NextGen did not disclose to its ONC Accredited Certifying Body (ONC-ACB) and ONC Authorized Testing Laboratory (ONC-ATL) that NextGen had (1) embedded functionality that was critical to the certification of the EHR product in a temporary version of a separate software product known as its "Knowledge Based Model" or "KBM," (2) relied on this temporary version of the KBM during certification testing for the EHR product, and (3) later released its EHR product to its users despite it lacking the functionality needed to satisfy all of the requirements for certification.

6.      Specifically, versions 5.8.0.77, 5.8.1, 5.8.2, and 5.8.3 of NextGen's EHR did not support the full scope of the certification criteria for its users in the clinical setting, including that it did not allow users to electronically record patients' problem lists and family history in the required code vocabulary, to create transition of care and referral summaries, or to record vital signs or calculate body mass index.

7.      Because NextGen's EHR technology as ultimately released to its users did not contain all the functionality required for its certification, NextGen knowingly caused eligible healthcare providers who used versions 5.8.0.77, 5.8.1, 5.8.2, and 5.8.3 of its EHR product to falsely attest to compliance with CMS requirements necessary to receive Medicare incentive

2

payments during the reporting periods for 2014 through 2016 and Medicaid incentive payments during the reporting periods for 2014 through 2017.

8. Further, between January 2011 and July 2017, NextGen provided improper remuneration to induce providers to purchase, retain, or recommend its EHR technology in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b.

9. As a result, the United States alleges that between January 2011 and July 2017, certain NextGen users purchased EHR technology from NextGen as a result of kickbacks and then submitted tainted claims for incentive payments under the Meaningful Use Programs.

10. NextGen's false and fraudulent statements and conduct violate the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 *et seq.*

## **PARTIES**

11. The United States, acting through CMS, administers the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq,* (Medicare); administers grants to states for Medical Assistance Programs (Medicaid) pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq*; and also administers the Medicare and Medicaid Meaningful Use programs. The United States, acting through ONC, created and administers a certification program for EHR technology.

12. Relator Elizabeth Ringold is a Nurse Practitioner and Relator Toby Markowitz is a Registered Nurse, both of whom use NextGen's EHR in their positions as healthcare providers within the South Carolina Department of Corrections. On November 19, 2018, Relators filed this case under the FCA's *qui tam* provisions.

13. NextGen is a publicly owned developer and vendor of health information technology.

3

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has supplemental jurisdiction over the common law cause of action under 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over NextGen and venue is appropriate in this Court under 31 U.S.C. § 3732(a) because NextGen transacts business in this District and events giving rise to these claims occurred in this District.

## LEGAL AND REGULATORY BACKGROUND

### I.     The False Claims Act

16.     The FCA imposes civil liability on any person who, *inter alia*: (1) knowingly presents, or causes to be presented, to an officer, employee, or agent of the United States a false or fraudulent claim for payment or approval; and (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A) and (B).

17.     The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest . . . . " *Id.* § 3729(b)(2).

18.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate

4

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *Id.* § 3729(b)(1)(B).

19. The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

20. Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government. *Id.* § 3729(a)(1).

## II.    The Anti-Kickback Statute

21. The federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), provides, in pertinent part:

> (2)    Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person
>
> > (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.

22. Accordingly, EHR developers such as NextGen may not offer or pay any remuneration, in cash or in kind, directly or indirectly, to induce physicians or hospitals or others to order or recommend their products if those products are paid for in whole or in part by Federal healthcare programs such as Medicare and Medicaid.

23. The Patient Protection and Affordable Care Act (PPACA), Publ. L No. 111-148,

124 Stat. 119 (2010), provides that violations of the AKS are per se violations of the FCA: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the FCA]."

24.      The PPACA also clarified the intent requirement for the Anti-Kickback Statute, and provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation."

## III.    The Meaningful Use Programs

25.      On February 17, 2009, Congress enacted the HITECH Act to promote the adoption and meaningful use of certified EHR technology. Under the HITECH Act, ONC established a certification program for EHR technology. As part of the certification program, an EHR developer that seeks to have its technology certified must provide documentation and evidence to an ONC-ATL and an ONC-ACB that the relevant technology meets the full scope of the certification requirements established by ONC. The ONC-ATLs and ONC-ACBs test and certify that developers' EHRs are compliant with the certification requirements.

26.      Through the Meaningful Use programs, certain healthcare providers receive incentive payments for demonstrating meaningful use of certified EHR technology. Individual practitioners ("Eligible Professionals") could qualify for up to a total of $43,720 over five years from Medicare (ending after 2016) or up to a total of $63,750 over six years from Medicaid (ending after 2021).

27.      To qualify for incentive payments under the Meaningful Use programs, Eligible Professionals were required, among other things, to: (1) use an EHR system that qualified as certified EHR technology; and (2) satisfy certain objectives and measures relating to their meaningful use of the certified EHR technology.

28.     HHS implemented the separate, but complementary, EHR technology certification criteria (ONC) and incentive payment requirements (CMS) in multiple stages. On September 4, 2012, HHS published in the Federal Register the final rules setting forth the ONC "2014 Edition" certification criteria for certified EHR technology, and CMS "Stage 2" meaningful use requirements for incentive payments. As established in CMS's final rule, in Stage 2, an Eligible Professional's use of certified EHR technology generally needed to satisfy seventeen "core objectives" and three out of six "menu set objectives."

29.     On October 16, 2015, CMS published in the Federal Register a final rule with comment period setting forth the "Modified Stage 2" meaningful use requirements for incentive payments. For years 2015 through 2017, Modified Stage 2 eliminated the concept of "menu set objectives" and required all Eligible Professionals to attest to a single set of objectives and measures.

30.     To obtain certification, EHR developers must represent to an ONC-ACB that their EHR product satisfies the full scope and functionality of the certification criteria for which they have applied, and submit to and pass certification testing by an ONC-ATL. In so doing, EHR developers must specify all of the software components external to the EHR relied upon to perform the certification criteria. *See* 77 Fed. Reg. 54163, 54274-5 (Sept. 4, 2012).

31.     Testing and certification are based on the scope of the specific regulatory criteria that the developer represents its EHR technology satisfies and on which the developer requests to be tested and certified. Specifically, the ONC-ATL relies on the developer's representations regarding its product's capabilities and uses only the ONC-approved test methods that relate to the regulatory criteria for which the developer has requested testing and certification. The ONC-ACB likewise relies on the developer's representations regarding the capabilities of its product

7

and bases certification decisions on those representations and the testing performed by the ONC-ATL.

32.     Certification testing does not confirm that each criteria and standard is satisfied in full and under every conceivable scenario. Rather, testing takes a snapshot of a product's capabilities by ensuring it can pass certain test cases for which developers are provided the test scripts in advance.

33.     A key purpose of the certification process is transparency: "certification focuses on providing assurance to [providers] that EHR technology certified to a certification criterion includes the specified capabilities, that those capabilities perform correctly and, where applicable, that those capabilities properly utilize/support adopted standards." 77 Fed. Reg. at 54167.

34.     In order to obtain certification, an EHR developer must accurately represent to ONC that its technology complies with all applicable conditions and requirements of the functionality for which the developer seeks certification. Among other things, the developer must ensure that its EHR technology will be able to accurately, reliably, and safely perform its certified capabilities in the field.

35.     To qualify for incentive payments in each stage of the Meaningful Use programs, healthcare providers were required to attest each year that they used certified EHR technology and satisfied the applicable Meaningful Use objectives and measures. Use of certified EHR technology and satisfaction of applicable Meaningful Use objectives and measures are material to payment under the Meaningful Use programs.

**ALLEGATIONS**

## I. NEXTGEN'S EHR FAILED TO SATISFY THE REQUIREMENTS FOR CERTIFICATION, CAUSING ITS USERS TO SUBMIT FALSE CLAIMS FOR INCENTIVE PAYMENTS

36.     In order to obtain certification of its EHR technology to the 2014 Edition EHR certification criteria, NextGen represented that its ambulatory product, 5.8.0.77, could perform all the required functionality to be certified as a "complete EHR."

37.     Version 5.8.0.77, however, did not contain all the capabilities to which it was certified. Instead, NextGen had attempted to place necessary functionality in a separate product—the KBM—and concealed its reliance on a temporary version of this product from the ONC-ACB and its users.

38.     Accordingly, NextGen's Version 5.8.0.77 users were not eligible for the EHR incentive payments they received because NextGen's EHR Version 5.8.0.77 was certified as a complete EHR based on misrepresentations, and NextGen's EHR did not work in the field consistent with the certification criteria to which it was certified.

### A.     NextGen Used a Temporary KBM To Pass Certification Testing.

39.     Throughout 2012 and early 2013, NextGen pressured its employees to pursue certification of its EHR technology to the 2014 Edition standards before competitors. NextGen leadership established demanding deadlines and admonished employees that "we cannot lag behind our competitors in getting certified." To meet the deadlines, NextGen decided not to code some of the functionality required to be certified as a complete EHR under the 2014 Edition standards into its EHR technology. Instead, to save time and money, NextGen relied heavily on an auxiliary product called the KBM to perform some required functions rather than develop these functions in its EHR Version 5.8.0.77.

40.     The KBM is a template-based software adjunct.  In other words, the KBM is a collection of templates that interact extensively with, but are developed separately from, NextGen EHR Version 5.8.0.77.  Changes and additions can be made much faster in the templates than in the core EHR technology engine, but the KBM does not call on central tables of data like proper software does.  Instead, developers cut and pasted pieces of code in hundreds of different templates throughout the KBM, multiplying the possibility of error and making updates and quality assurance impracticable.  NextGen's top executives recognized that relying on the KBM was problematic and that its faulty architecture meant that NextGen technology that utilized the KBM would "have these issues until the platform is replaced."

41.     Even though Version 5.8.0.77 and the KBM were still under development in early 2013, NextGen determined to proceed with certification of Version 5.8.0.77 in February 2013 as "[a] delay would impact Sales."

42.     Accordingly, NextGen designated a temporary version of the KBM as the "Meaningful Use" version to be used in conjunction with Version 5.8.0.77 and, for use only during certification testing, built certain functionality needed to pass the ONC-ACB certification test as a complete EHR into that version of the KBM, "creating NextGen-specific test scripts and any required templates for cert purposes."  NextGen employees characterized the approach to obtaining certification of Version 5.8.0.77 by relying on functionality in a version of the KBM "that isn't going to market and will never be updated" as "smoke & mirrors."

43.     One developer expressed amazement "that this is how we are going to certify . . . and surprised we can 'get away' with that."  Another employee commented that this use of a temporary KBM "makes what we show [the regulators] as discardable and non-usable as in faking the certification."  But NextGen disregarded such concerns on the ground that if NextGen

waited for a fully functioning KBM "it [would] create a 2+ month delay in certification."

44. NextGen leadership claimed that it could rely on a temporary product for certification testing because the company was submitting EHR Version 5.8.0.77—and not the KBM—for certification. Although NextGen relied on the temporary KBM product to demonstrate the required functionality for a complete EHR, when completing the standard ONC-ACB questionnaire that required disclosure of any "Additional Software Used in Testing," NextGen did not disclose that it used the KBM during the certification testing for Version 5.8.0.77.

45. By concealing its use of the KBM from the ONC-ACB handling NextGen's certification, NextGen misrepresented the capabilities of Version 5.8.0.77, which could not perform all of the functionality required of a "complete EHR" during certification testing, and was, moreover, heavily dependent on the temporary version of the KBM that NextGen prepared only for testing.

46. Upon information and belief, the KBM that NextGen used, but failed to disclose to its ONC-ACB, for Version 5.8.0.77 certification testing could demonstrate only the specific tasks required by the published test scripts, and not the full functionality that NextGen represented that Version 5.8.0.77 could perform.

47. The exact role played by this temporary KBM during certification testing cannot be ascertained because NextGen did not retain the product following testing. Nevertheless, the technological limitations of Version 5.8.0.77 establish that NextGen needed the temporary KBM to present Version 5.8.0.77 as having functionality the product did not truly possess.

48. Thus, at the time of certification testing in February 2013, NextGen's Version 5.8.0.77 technology was not in fact a complete EHR despite NextGen's representations to that

effect. Indeed, as one NextGen manager wrote, "It was always hacked to pass."

49.     After obtaining certification of Version 5.8.0.77 as a complete EHR in March 2013, NextGen employees expressed concern about the missing capabilities. One employee declared after certification: "What we have done is like what BP did in the gulf—we have plugged the leak, now the clean up effort starts." Another employee stated, "if we are unable to deliver the functionality that we showed in the testing and clients elevate that to ONC our certification status is at risk."

50.     Over the next seven to eight months, NextGen struggled to develop Version 5.8.0.77 into a product that – even when used in conjunction with the KBM software – would have the functionality required in the field. Although NextGen obtained certification in February 2013, it finally released Version 5.8.0.77 and a revised version of the KBM (KBM 8.3) in the fall of 2013.

51.     When NextGen released 5.8.0.77, it did not have all functionality required for its certification. Thus, a provider using only Version 5.8.0.77 without KBM 8.3 could not perform many of the functions of a certified EHR, despite the fact that "meaningful use" of a certified EHR was necessary to claim incentive payments. Internally, NextGen employees acknowledged that "this is going to bite us if we don't make it clear that they have to use 8.3." However, because NextGen had failed to disclose its reliance on the KBM for certification testing, NextGen could not publicly admit that KBM 8.3 was required to perform some of the criteria on which NextGen's EHR had been certified. So NextGen falsely informed its users that Version 5.8.0.77 had the functionality of a complete EHR.

**B. NextGen's EHR Technology Could Not Fully Perform All of the Certified Functionalities Required**

52.     SNOMED coding. One of the capabilities that an EHR needed to meet the certification criteria for a complete EHR under the 2014 Edition was the ability to translate recorded patient information into standardized clinical terminology known as Systematized Nomenclature of Medicine – Clinical Terms (SNOMED CT). ONC requirements for certification required that the EHR allow healthcare providers to use SNOMED codes in connection with data software functions that enabled users to electronically record a patient's active problem list and family health history. 45 C.F.R. §§ 170.314(a)(5); 170.314(a)(13).

53.     The use of SNOMED CT codes enables providers and EHRs to communicate in a common language, which improves the quality of patient care across different providers and care episodes. SNOMED CT was adopted, in part, because it was determined by ONC to be "the best vocabulary to use in those certification criteria that focus on electronic health information exchange." 77 FR 54210.

54.     Yet, rather than place the functionality required to assign SNOMED codes in the EHR, NextGen "infused" the SNOMED coding required to pass certification testing into the KBM. NextGen developers complained internally that Version 5.8.0.77 "should be able to accommodate these requirements," but NextGen ultimately omitted that functionality from its certified EHR. As a result, Version 5.8.0.77 provided no means for users to record certain data in the required vocabulary.

55.     While NextGen attempted to patch this missing functionality with KBM 8.3, this product was never vetted through the certification process that Version 5.8.0.77 had undergone and was deeply flawed. Often, SNOMED codes were missing in KBM 8.3 or the KBM assigned

the wrong code, resulting in inaccurate information on a patient medical record.  In some instances, a code from an entirely different code vocabulary was recorded instead of a SNOMED code.

56.     As a result, NextGen 5.8.0.77 users who attested to the use of certified EHR could not consistently record patient problem lists and family health histories electronically in the format required for a certified EHR.

57.     CCDA.  Another requirement under the 2014 Edition that NextGen's EHR could not perform was enabling providers to create conforming patient summaries.  Under the ONC regulations, EHR technology must enable users to electronically create a transition of care, as well as a referral summary for all patients within the EHR technology in a consolidated clinical document architecture (CCDA) format. 45 C.F.R §§ 170.314(b)(2), 170.314(e)(2).

58.     Version 5.8.0.77 did not have the capability to create referral summaries with this core set of data about a patient's health, and so to pass certification testing, NextGen relied heavily on the temporary KBM to present the appearance that Version 5.8.0.77 could perform this function.

59.     Even when Version 5.8.0.77 was used in conjunction with KBM 8.3, due to NextGen's certification shortcuts, users of Version 5.8.0.77 produced non-conforming CCDAs.  For example, in 2014, NextGen realized that it was pulling the wrong information into the CCDA as part of the "plan of care" requirement, with a developer noting, "I'm not sure how we passed [certification] on it."  He hypothesized, "I'm guessing we hacked it and then likely someone said 'it needs to get reviewed after certification' and it never was."

60.     Thus, users without KBM 8.3 who attested to using certified EHR based on their use of Version 5.8.0.77 could not create a CCDA, and even users who did obtain KBM 8.3 often

could not generate an accurate CCDA despite this being an ONC certification requirement for a complete EHR that Version 5.8.0.77 was obligated to meet.

61. <u>Vital signs.</u> Per ONC requirements, 2014 Edition EHR technology certified as a complete EHR must record vital signs, specifically it must enable a user to electronically record, change, and access a patient's height, weight, and blood pressure and automatically calculate and display body mass index (BMI). *See* 45 C.F.R. §170.314(a)(4).

62. Yet, Version 5.8.0.77 did not have the capability to perform most of these required tasks—either at the time of certification or when the EHR was released to users.

63. Moreover, while NextGen attempted to place vital sign functionality into KBM 8.3, it was not part of NextGen's certified EHR. Version 5.8.0.77, even with KBM 8.3, continued to have serious defects, with users encountering serious issues related to vital signs. For example, NextGen internally noted that KBM 8.3 was "grossly miscalculat[ing]" the BMI and converting percentiles erroneously in young children.

64. In sum, because of the functionality that Version 5.8.0.77 lacked and the misrepresentations made by NextGen as to the product's capabilities, NextGen achieved certification of its EHR to the 2014 Edition certification criteria through fraudulent means.

## C. By Falsely Obtaining Certification, NextGen Caused False Claims to Meaningful Use Programs

65. CMS expressly linked user attestations in the Meaningful Use programs to the ONC EHR certification criteria to "ensure that certified EHR technology can accomplish meaningful use and meaningful use has the intended consequences of improving the healthcare priorities that make up meaningful use." 75 Fed. Reg. 44313, 44331 (July 28, 2010). However, because NextGen obtained certification for Version 5.8.0.77 by falsely representing that this

technology met the criteria for certification, NextGen users represented—ultimately falsely—that the product they relied on in attesting to meeting the Meaningful Use criteria was properly "certified EHR technology" in practice.

66. Moreover, subsequent versions of Version 5.8.0.77—5.8.1, 5.8.2, and 5.8.3— were tainted by NextGen's misrepresentations during the certification of Version 5.8.0.77 and shared its missing capabilities. Because NextGen attested to its ONC-ACB that it had made no changes adversely affecting the certified capabilities, NextGen, despite knowing that these versions did not contain the full functionality required of a complete EHR, was allowed to gain certification for later iterations of Version 5.8 without undergoing testing through ONC's "inherited certification" process.

67. In light of NextGen's misrepresentations and omissions to its ONC-ACB and ONC-ATL regarding the functionality of Version 5.8.0.77, 5.8.1, 5.8.2, and 5.8.3, these technologies did not qualify as certified EHR. As a result, users who relied on NextGen's representation that these products were certified, unknowingly falsely attested that – because they had, in addition to meeting other conditions, used certified EHR technology – they were eligible to receive Meaningful Use incentive payments.

## II. NEXTGEN'S REFERRAL PROGRAM PAYMENTS VIOLATED THE ANTI-KICKBACK STATUTE

68. Between January 2011 and July 2017 (hereinafter "the relevant time period"), NextGen paid unlawful remuneration to influential customers for purposes of increasing sales. Among other things, at various times during the relevant period, NextGen made unlawful payments, and provided credits, gifts, and other things of value in order to induce prospective and current customers to purchase, retain, or recommend its EHR.

69. Through its Premiere Reference Program, membership in which was often used as an incentive to purchase NextGen's EHR, NextGen paid customers to refer new customers and host site visits.

70. NextGen gave premiere references credits worth a percentage of any ensuing sale, usually 2 percent and capped at $10,000. The amount had no relation to the cost of hosting the visit, and a reference was only paid if the potential customer made a purchase within a few months of the visit. The credits could be used to pay for software licenses, maintenance, and other services from NextGen,

71. Under the terms of the Premiere Reference Agreement, members were required to "be a positive showcase." NextGen offered specific site visit hosting opportunities to members based, in part, on how satisfied members currently were with NextGen's EHR or how glowing a reference they would provide. Because of this, members often received additional services or faster technical support than non-members.

72. NextGen failed to disclose to prospective customers that references would be compensated by NextGen if the prospective customer purchased NextGen's EHR. In doing so, NextGen incentivized providers to act as an extension of NextGen's salesforce, while appearing to be mere consumers of NextGen EHR with objective opinions and experiences to relay and no financial incentive to recommend the product.

73. Beyond offering membership in the Premiere Reference Program, NextGen also offered things of value to induce providers to purchase its EHR. For instance, key decision makers at prospective clients were offered free tablets to listen to a sales pitch.

74. NextGen also provided other gifts to references, as well as to current customers who threatened to leave NextGen. Such remuneration included meals and tickets to sporting

events and entertainment, all for the purpose of inducing these users to either continue using NextGen's products or recommend NextGen to other health care providers who would and did use federal funds to purchase NextGen's products and services.

75.     Solely in connection with payments that it made under its formal reference and referral programs, NextGen doled out approximately $1 million between January 2011 and July 2017.

## COUNT I
### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

76.     Through the conduct alleged above, NextGen knowingly caused healthcare providers who used its EHR technology to present false or fraudulent claims for federal incentive payments that were paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(A).

77.     The United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II
### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

78.     Through the conduct alleged above, NextGen knowingly made or used false records or statements material to false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B).

79.     As a result of the false records or statements made by NextGen, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT III
## Unjust Enrichment

80.     The United States claims the recovery of all monies by which NextGen has been unjustly enriched, including profits earned by NextGen because of the unlawful conduct alleged above.

81.     NextGen was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

82.     By this claim, the United States requests a full accounting of all revenues and costs incurred by NextGen, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## PRAYER

WHEREFORE, Plaintiff the United States of America prays for judgment against the Defendant as follows:

83.     On Counts I and II under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

84.     On Count III for unjust enrichment, for the damages sustained and/or amounts by which NextGen retained illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be just and proper.

Dated: July 13, 2023

Respectfully submitted,

UNITED STATES OF AMERICA

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
JAMIE A. YAVELBERG
EDWARD C. CROOKE
CHRISTELLE KLOVERS
KELLEY HAUSER
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 514-6831
edward.crooke@usdoj.gov
christelle.klovers@usdoj.gov
kelley.hauser@usdoj.gov

NIKOLAS P. KEREST
United States Attorney

By: _____

LAUREN ALMQUIST LIVELY
Assistant U.S. Attorney
11 Elmwood Ave
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
lauren.lively@usdoj.gov

Attorneys for the United States

20